**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

STEPHEN JOHN SIMMONS,

      Plaintiff,

    V.                                CASE NO.   3: 00-CV-1316-J-99MMH

THE UNITED STATES OF AMERICA,

      Defendant.

_____/

## <u>O R D E R</u>

This cause comes before the Court on Defendant's Supplemental Memorandum (Dkt. 46), Plaintiff's Supplemental Memorandum (Dkt. 48) in opposition thereto, and Defendant's Notice of Supplemental Authority (Dkt. 47).[1] These filings supplement the Defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(1), etc. (Dkt. 24) and Plaintiff's Memorandum (Dkt. 37) in opposition thereto, which Motion was dealt with and partially disposed of by the Court's Order (Dkt. 43) of February 6, 2003.  Also pending herein, and related to the Supplemental Memoranda, are Plaintiff's Motion to Strike (Dkt. 49) portions of Defendant's Supplemental Memorandum and Defendant's Response (Dkt. 50) in opposition thereto. Defendant subsequently filed a Notice to Court Pursuant to Local Rule 3.01(h) (Dkt. 53).

---

[1] By the Court's Order (Dkt. 45), Defendant's Supplemental Memorandum was due to be--and was--filed March 24, 2003.  The authority cited in and attached to Defendant's Notice of Supplemental Authority (Dkt. 47) was decided March 25, 2003.  Defendant's said Notice is thus not improper additional briefing and therefore will be considered by the Court. (Plaintiff has not objected to said Notice.)

I.      **Introduction and Procedural Background**

By this action, Plaintiff seeks to recover for personal injuries and property damage he suffered when the private motor boat he was operating in the St. John's River allided with a piling structure in the waters adjacent to the United States Naval Air Station Jacksonville ("NASJAX").  These structures, which support landing direction lights and approach direction lights for the adjacent helicopter landing pads, are part of the NASJAX facility.

In two Counts with identical factual allegations but invoking different statutes, Plaintiff asserts that the Defendant United States of America, as owner of NASJAX and the piling structures, negligently maintained the subject piling structures and surrounding area by, inter alia, failing to properly light them and also failed to warn Plaintiff of the existence of the dangerous condition created by the piling structures, resulting in the allision and causing Plaintiff to suffer injuries and incur damages.  Specifically, Count I asserts such claims under the Suits in Admiralty Act ("SIAA") and the Public Vessels Act ("PVA"), while Count II asserts such claims under the Federal Tort Claims Act ("FTCA").[2]

Plaintiff has previously stipulated that his claims are not viable under the PVA or FTCA. See Dkt. 27.  By Order of February 6, 2003, the Court thus dismissed Plaintiff's PVA and FTCA claims based on that stipulation. See Dkt. 43 n.3.  In that same Order, the Court also concluded that Plaintiff's Count I SIAA claims against the United States for negligence in illuminating or otherwise physically marking the subject piling structures, whether based on the

---

[2] In the Court's prior Order, the Court established this same acronym as a shorthand reference to the Federal Tort Claims Act, and then failed to abide its own vernacular. See, e.g., Dkt. 43 at pp.2, 3 (referring to "FCA").  Such was in error.

acts and/or omissions of the U.S. Coast Guard or of the U.S. Navy, were barred by the discretionary function exception ("DFE") to the SIAA. See Dkt. 43 at pp. 15-19 (part III.C. thereof).

As set forth in the Court's prior Order, see Dkt. 43 pp. 11-13 (part III.A. thereof), it is fairly debatable whether Plaintiff's Count I SIAA claim also encompasses a claim against the United States for negligence in charting the subject piling structures, based on the acts and/or omissions of the National Oceanic and Atmospheric Administration ("NOAA") in issuing Chart No. 11492 (Dkt. 28, Ex. S-4)(18th ed. Oct.24/98)(hereinafter "Chart").[3]  Plaintiff's Complaint does assert that "[t]he Defendant, United States, negligently maintained the subject platform and the area surrounding the platform by, but not limited to, failing to properly light the platform, and by failing to properly warn the Plaintiff of the existence of the dangerous condition of the platform," see Dkt. 1 at ¶ 5 (emphasis added), but the pleading makes no mention of the agent of the United States who is alleged to have acted negligently.

Given the foregoing; that the subject piling structures lie off of a U.S. Naval Air Station; that it is the province of the U.S. Coast Guard to establish and maintain aids to navigation and to mark hazards to navigation; and the testimony of the Plaintiff herein that, although he was familiar with the Chart and its depiction of the subject piling structure, on the night in question

---

[3] As referenced in different parts of this Order, civilian nautical charts of the navigable waters of the United States are produced by the Office of Coast Survey ("Coast Survey").  Coast Survey is an office within the National Ocean Service, which is a branch of NOAA, which, in turn, is part of the U.S. Department of Commerce.  In this Order, when speaking of the policies and practices and alleged acts and omissions of the relevant agent of the Defendant United States in charting the subject piling structures, the Court will generally refer to NOAA or, in some specific contexts, to Coast Survey. However, certain documents, other evidence, and caselaw discussed herein uses one of Coast Survey's former names: the Office of Coast and Geodetic Survey, or USC&G (not to be confused with USCG, the common acronym for the U.S. Coast Guard.)  Where such documents, evidence, or caselaw are discussed, the former name of Coast Survey will be used to maintain consistency with the cited material.

he was navigating based on his experience with and memory of the River's shoreline and its features, and did not have the Chart with him; it was reasonable to conclude that the Plaintiff's claims were limited to acts or omissions of the United States in illuminating or otherwise physically marking the subject piling structures, whether through the Navy or the Coast Guard. And Defendant appeared to so conclude, limiting its DFE summary judgment arguments to the acts and/or omissions of the Navy and Coast Guard.  However, in responding to Defendant's motion, Plaintiff--for what appeared to the Court to be the first time--asserted and argued a theory of negligent charting based on the acts and/or omissions of NOAA in the depiction and labeling of the subject piling structures on NOAA Chart 11492. See Dkt. 37 at pp. 3-6.

But, because the Plaintiff was familiar with the Chart and its depiction of the piling structures; because such a negligent charting theory could arguably be brought within the scope of Plaintiff's allegation that the Defendant "fail[ed] to properly warn the Plaintiff of the existence of the dangerous condition of the platform"; and because the Court concluded it would be most efficient to permit the parties to argue the negligent charting theory now, by its February 6, 2003, Order (Dkt. 43) the Court directed the parties to supplement their briefs regarding the application of the DFE to NOAA's charting of the subject piling structures.[4]

---

[4] Defendant was slightly prescient in this regard.  Just a few days before the Court issued its February 6, 2003, Order (Dkt. 43), Defendant submitted its Motion for Leave of Court to File Reply, etc. (Dkt. 42).  Therein, and in the proposed Reply attached thereto, Defendant sought, inter alia, to submit briefing that addressed what it asserted was Plaintiff's newly-raised negligent charting theory.  For various reasons explained in the Court's prior Order, the Court denied that Motion--as a result, Defendant's proposed Reply has not been filed--and the Court proceeded on its originally intended course: directing the parties to submit supplemental memoranda focused solely on the issue of the DFE and Plaintiff's negligent charting claim.

Those Supplemental Memoranda (Dkts. 46, 48) have now been submitted.  However, before turning to the substantive issue, it is necessary first to take up Plaintiff's Motion to Strike.  Therein, Plaintiff raises various objections to certain evidence on which Defendant relies in its Supplemental Memorandum.

## II.     Plaintiff's Motion to Strike

With its Supplemental Memorandum (Dkt. 46), Defendant has submitted the "Declaration of Capt. Nicholas Perugini" (Dkt. 46, Attach.), the Chief of the Marine Chart Division in the Office of Coast Survey.  Capt. Perugini's duties include overseeing the production and issuance of nautical charts, including the Chart at issue in this case.  Attached to Capt. Perugini's Declaration (but filed in an expandable folder separate from the case file) are the following: excerpts from the Nautical Chart Manual, 7th ed. (corrected to Oct. 24, 1998) (Dkt. 46, Attach., Ex. A thereto); excerpts from the Desk Reference Guide to the depiction of features on NOAA's nautical charts (Dkt. 46, Attach., Ex. B thereto); and certain source documents used in the charting of the subject piling structures (Dkt. 46, Attach., Ex. C thereto).

Plaintiff's Motion to Strike is directed at this Declaration and its various exhibits.  Plaintiff's subject Motion raises several issues and moves for relief in the alternative, should the Court not strike the objected-to evidence.  Each of these contentions and requests will be dealt with in turn.

### A.     Capt. Perugini's Declaration

Plaintiff objects to Defendant's introduction of and reliance on the testimony of Capt. Perugini, as contained in the Declaration, based on its asserted late disclosure.  Plaintiff points

out that Capt. Perugini was not disclosed, whether as an expert or lay witness, during discovery in the case and was not listed in the Pretrial Stipulation (Dkt. 30) filed by the parties. Thus, having not learned of Capt. Perugini and his testimony until the Declaration was filed, Plaintiff objects to such.

Defendant responds by asserting that it was Plaintiff's "last-minute change in the theory of his case [that] necessitated the [D]eclaration." Defendant asserts that the Declaration was necessary to explain the existence of any statutes, regulations, or policies controlling NOAA's actions in producing charts, as such is an element of the analysis under the DFE, and because the Court required the Defendant to submit supplemental briefing on the application of the DFE to such activities.

The Court finds Plaintiff's objection to Defendant's disclosure and use of Capt. Perugini's Declaration should be denied. Defendant's asserted delay in disclosing Capt. Perugini and his testimony was because Defendant, unaware that Plaintiff was pursuing a negligent charting theory, had not obtained a witness from Capt. Perugini's Office. As the Court has already found, Plaintiff delayed in actively pursuing its negligent charting theory until he filed his Memorandum (Dkt. 37) in opposition to Defendant's dispositive Motion (Dkt. 24). Because Plaintiff filed that responsive Memorandum first actively asserting his negligent charting theory well after the close of discovery, he cannot complain of Defendant's "late"

obtaining of a witness to defend against that theory.[5]  The Court will thus overrule Plaintiff's

objection to Defendant's disclosure and use of Capt. Perugini's Declaration.[6]

### B.        The Nautical Chart Manual Excerpts

In his Declaration, Capt. Perugini explains that the Nautical Chart Manual ("Manual")

is the primary reference document used by Coast Survey in describing and depicting on nautical

charts the various features which exist on the waters and shorelines of the United States.  The

edition of the Manual Defendant has submitted was the version used when the Chart at issue

was prepared.

While Plaintiff's subject Motion points out that the Manual was not listed in the Pretrial

Stipulation, Plaintiff states that he only objects to the introduction of excerpts of the Manual,

and does not object to introduction of the entire Manual.[7]  Plaintiff then requests that

> the Court not . . . consider any evidence contained in the . . .
> Manual unless and until Defendant provides the Court and Plaintiff
> with a complete manual and the Court allows the Plaintiff to submit

---

[5] Likewise, as set forth below, Plaintiff also cannot complain that he has not had the opportunity to pursue this theory in discovery and/or to use discovery to probe and test Defendant's evidence in defense thereof.  Plaintiff did have an opportunity to conduct discovery on such a theory, but apparently did not do so.

[6] Elsewhere in the subject Motion, but in a partially related contention, Plaintiff asserts that the Nautical Chart Manual is self-explanatory and thus requires no interpretation by Perugini. The Court disagrees.  At a minimum, Capt. Perugini's testimony is necessary to identify and authenticate this document as the one used by his Office in preparing charts, including the one at issue. Further, Capt. Perugini's testimony is necessary to explain how his Office uses the Manual.  True, portions of the Declaration do point out what are largely self-explanatory sections of the Manual that could be gleaned from a review of the submission, but such is done by Capt. Perugini in the context of explaining the practices and procedures of his Office and identifying the specific sections of the Manual underlying those practices and procedures.  Such is not uncommon testimony for a witness explaining the practices of his business.  Thus, to the extent the above is an objection by Plaintiff to Capt. Perugini's testimony, the Court overrules that objection.

[7] To the extent Plaintiff is objecting to the Manual based on Defendant's asserted late disclosure thereof, such objection is overruled for the same reasons as the similar objections to Capt. Perugini's Declaration were overruled.  See, supra, part II.A.

7

an additional Memorandum with argument regarding its applicability to this case.

Dkt. 49 at ¶3.

Defendant does not directly address this contention in its Response (Dkt. 51) to the subject Motion to Strike. However, attached to that Response is what appears to be a copy of the entire Manual. See Dkt. 51, Attachs. (Vols. 1 & 2 of the Manual). And the Response represents that a copy of the entire Manual was contemporaneously provided to Plaintiff.

Plaintiff's objection (of sorts) has thus been partially mooted by Defendant's submission--and provision to Plaintiff--of a copy of the Manual. But this still leaves Plaintiff's request that he be provided the opportunity to submit an additional memorandum regarding the applicability of the Manual to this case. The Court will deny that request. As noted above, the negligent charting claim is one that Plaintiff chose to pursue late in this case, and thus he cannot complain about matters related to his asserted inability to fully discover evidence both supporting and undermining that theory.[8]

C.      The Desk Reference Guide

In his Declaration, Capt. Perugini explains that the Desk Reference Guide ("Guide"), which sets forth some of the various conventions for describing and depicting features on

---

[8] The full citation to the Manual is "[volume number] U.S. Dep't of Commerce, Coast and Geodetic Survey, Nautical Chart Manual [section and/or page number] (7th ed. 1992)(corrected to Oct. 24, 1998)." Hereinafter, all citations to the Manual in this Order are to the complete copy filed by Defendant. See Dkt. 51, Attachs. When citing thereto, the Court will not refer to the docket number, but will simply cite to the Manual itself by volume number, the acronym "NCM," section number or appendix number, and, where helpful to the reader, page number.

nautical charts, is one of the publications used by his Office in preparing charts, including the Chart at issue here.[9]

Plaintiff objects to the Desk Reference Guide on the following grounds that it: (1) was not listed in the Pretrial Stipulation; (2) was not otherwise disclosed by Defendant during the course of discovery; (3) was developed by a private contractor and not by Capt. Perugini's Office; and (4) "contains information that necessitates explanation." Dkt. 49 at unnumb. pp. 2-3.[10]

Defendant has not specifically responded to these objections, particularly the third and fourth ones listed above.  Rather, Defendant's response appears to be contained in its general assertion that Plaintiff cannot now complain about evidence that Defendant has obtained and brought forth to counter the negligent charting theory raised so late in this case by Plaintiff.

The first and second objections listed above will be overruled for the same reasons that those objections were not compelling as to the other items of evidence considered herein and discussed above.

As to the third (and/or fourth) objection(s) listed above, Plaintiff's complaint that the Guide was prepared by a private contractor seems to go more to its weight than its admissibility. In any event, it is clear from the Guide's title page that it was prepared for use by Capt.

---

[9] The only version of the Guide submitted are those excerpts found at Dkt. 46, Attach., Ex. B thereto. Henceforward in this Order, the Guide will be cited simply as "DRG" followed by the page number, with no reference to the above docket number.

[10] It is not clear whether this last issue regarding the need for "explanation" of the Desk Reference Guide is a separate objection, or part of Plaintiff's objection regarding the fact that the Guide was prepared by a private contractor. The Court has thus considered these issues both separately and together.

Perugini's Office.  More importantly, it is clear from Capt. Perguini's Declaration that the Guide is an authoritative document adopted and used by Coast Survey, and one used at the time the Chart at issue was prepared.[11]  The objection will thus be overruled.

To the extent asserted separately, the fourth objection listed above will likewise be overruled.  The Guide does not require any more explanation than that already provided by Capt. Perugini--it is one of the publications which sets forth the various conventions for describing and depicting maritime features used by his Office in preparing charts and was used when the Chart at issue here was prepared.

### D.     The Source Documents for the Piling Structures

Plaintiff states that he has no objections to these various documents.

### E.     Plaintiff's Alternative Request for Relief

Should the Court not strike Capt. Perugini's Declaration--and presumably those exhibits to which Plaintiff has objected--Plaintiff alternatively requests that the Court "reserve ruling on Defendant's Motions, re-open discovery and extend the time for filing [the reports of] expert witnesses in order to allow the parties to discover the chart making process of the National Ocean[ic] and Atmospheric Administration." Dkt. 49 at unnumb. p.3.  Defendant opposes this request, asserting that Plaintiff previously had ample time to conduct discovery on this matter.

As discussed above, although his Complaint encompasses a negligent charting theory, Plaintiff first actively pursued and asserted this theory in his Memorandum in response to Defendant's dispositive motion, which Memorandum was filed well after the close of discovery.

---

[11] The Manual itself cross-references the Guide. See 1 NCM § 2.17 at 2-94.

He thus cannot complain of Defendant's "late" submission of evidence to defend against that theory and is not entitled to reopen discovery into a matter he previously had more than adequate opportunity to pursue.  Further, Plaintiff has been afforded the opportunity to review and respond to Defendant's evidence and arguments and had an equal opportunity to submit additional evidence in opposition.[12]

## III.    Standard of Review

That portion of Defendant's Motion (Dkt. 24) seeking to dismiss Plaintiff's claims for lack of subject matter jurisdiction based on the DFE is governed by Rule 12(b)(1), Federal Rules of Civil Procedure.  Caselaw arising under that Rule provides the standard for considering this aspect of Defendant's motion.  See Morrison v. Amway Corp., 323 F.3d 920, 924-25 n.5 (11th Cir. 2003); Garcia v. Copenhaver, Bell & Assoc., 104 F.3d 1256, 1260-61 (11th Cir. 1997); Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990); see also Dall v. United States, 42 F.Supp.2d 1275, 1278-79 (M.D. Fla. 1998).  These cases instruct as follows:

---

[12] Two matters bear noting in this regard.  First, following the Court's February 6, 2003, direction to the parties to submit supplemental briefing on the negligent charting theory, Defendant sought an extension of the Court-imposed deadline for doing so.  In seeking that extension, counsel for Defendant represented that he needed additional time to consult with the necessary personnel at NOAA (the newly-implicated agency) who would assist in the preparation of the Defendant's supplemental memorandum. See Dkt. 44.  Plaintiff did not oppose that request. See id.  Given the nature of the DFE analysis, and Defendant's previous submissions regarding the DFE's application to the actions and omissions of the Navy and Coast Guard, Plaintiff cannot claim surprise that Defendant obtained additional witness testimony and other evidence to address the negligent charting claim.

Second, discovery has been already been extended twice in this case. See Dkt. 6 (Order setting original discovery deadline of January 3, 2002); Dkt. 15 (Order on joint motion, inter alia, extending discovery deadline to April 1, 2002 and also extending expert disclosure deadlines); Dkt. 17 (Order on joint motion, inter alia, extending discovery deadline to July 22, 2002 and also extending expert disclosure deadlines).  Each of these extensions gave Plaintiff an ample opportunity to pursue discovery, including the retaining of experts and conducting of third-party discovery, in support of his negligent charting theory.

Under FRCP 12(b)(1), there are two types of challenges to subject matter jurisdiction: facial and factual.  A facial attack merely requires the Court to examine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction in his complaint.  For purposes of a facial attack, the allegations of the complaint are taken as true.  Such is to be contrasted with a factual attack, which challenges the existence of subject matter jurisdiction irrespective of the pleadings.  For purposes of a factual attack, matters outside the pleadings--such as affidavits, depositions, or documents--can be considered.  Assuming that the issue challenged regarding jurisdiction--i.e., the facts necessary to sustain such--do not implicate the merits of the plaintiff's cause of action, the Court can weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In considering a factual attack on jurisdiction that does not implicate the merits, no presumptive truthfulness attaches to the allegations of the plaintiff's case, and the existence of disputed facts material to subject matter jurisdiction does not preclude the Court from evaluating the merits of the jurisdictional claim for itself.[13]

---

[13] Where the defendant's attack on subject matter jurisdiction does implicate an element of the plaintiff's underlying claim, the Court is not permitted to weigh facts for itself and must resolve disputed factual issues in favor of the plaintiff, as non-movant. See Garcia, 104 F.3d at 1261 (holding that where defendant moved to dismiss ADEA claim for lack of subject matter jurisdiction contending that it was not an "employer," court was required to apply more deferential Rule 12(b)(6) or 56 standard to allegations of plaintiff's complaint because defendant's status as an "employer" was also an element of plaintiff's ADEA claim).  However, such is not the case here.  The issues raised by the relevant portions of Defendant's subject Motion--whether NOAA's alleged acts and omissions fall within the DFE--do not implicate the merits of Plaintiff's claims.  Nevertheless, in setting forth the facts found in part IV., infra, the Court was not required to resolve any factual disputes.

The parties having submitted matters outside the pleadings, and the Court having considered same, the Court will treat the subject Motion to Dismiss as a factual attack on subject matter jurisdiction.[14]

## IV.    Relevant Facts[15]

### A.    The St. Johns River, Naval Air Station Jacksonville, and NOAA Chart 11492

The St. Johns River ("River") flows northward through the City of Jacksonville and eventually empties into the Atlantic Ocean.  The United States Naval Air Station Jacksonville ("NASJAX"), located in the southern part of the City, sits on the west bank of the River.  As disclosed by NOAA Chart No. 11492 (Dkt. 28, Ex. S-4)(18th ed. Oct.24/98) (hereinafter, the "Chart"), the River is over one-mile wide through all of the southern portion of the City, including the stretch where NASJAX lies.

Helicopters are among the aircraft which operate from NASJAX.  The facility has helicopter landing pads immediately adjacent to the shoreline along the west bank of the River, below the portion of the River bank known as Piney Point and above that portion known as Black Point.  In the early to mid 1970's, the Department of the Navy let a contract to construct lighted structures to indicate the approach to those helicopter landing pads.  The original plans called for the construction of two rows of piling structures supporting these aids to aeronautical

---

[14] This same FRCP 12(b)(1) standard for a factual attack on subject matter jurisdiction was also applied, although not expressly stated, in the Court's February 6, 2003, Order (Dkt. 43).

[15] The following factual recitation focuses on those facts necessary to the resolution of Defendant's attack on subject matter jurisdiction.  Portions of this recitation are taken from the Court's prior Order (Dkt. 43) and, for convenience of the reader, are repeated herein instead of being incorporated by reference.  The additional facts presented here are those relevant to Plaintiff's negligent charting claim, which facts have been taken from both the original and the supplemental filings.

13

navigation, with each row extending out into the River from the NASJAX shoreline immediately adjacent to the helicopter landing pads. This portion of the River where these structures lie varies from one and three-quarters to two and one-half miles wide.

Although the United States Army Corps of Engineers ("Corps") approved construction of both rows of piling structures, only one row--the northernmost--was actually built. This 300-foot row consists of fifteen piling structures. Beginning seven feet from the shore are six single-pile structures, each consisting of one twelve-inch butt timber pile driven into the River bottom and protruding above the surface of the water. These single-pile structures are spaced fifteen feet apart and each carries one yellow landing direction light. Beyond the single pile structures are nine triple-pile structures, each consisting of three twelve-inch butt timber piles, driven into the River bottom, which protrude above the surface of the water and support a cross-beam. These triple-pile structures are spaced twenty-five feet apart and the cross-beam of each structure carries two white approach direction lights.[16]

According to the affidavits of William Meyer (Dkt. 25, Ex. 2; Dkt. 28, Ex. S-2), the NASJAX Air Field Facility Manager, the series of yellow and white lights on the piling structures conforms to Navy standards for helicopter approach and landing lighting. These lights are not shielded in any way and thus can be viewed from any direction, including from above. However, the lights on the piling structures are not operated continuously. Rather, pursuant to Navy guidelines, the lights are only operated during helicopter take-offs and

---

[16] Photographs of portions of the triple-pile section of the row can be found in the record as Exhibits B and C to Plaintiff's Affidavit (Dkt. 38) in opposition to Defendant's subject Motion.

landings, as illumination of the lights indicates to pilots that the helicopter landing pad is clear and authorized for use, and that emergency vehicles and personnel are standing by.  Further, applicable airfield safety clearance requirements mandate that there be no other lights or reflectors on or near either the approach or landing lights, so that pilots are presented with an unambiguous approach and landing path.  Thus, there are no lights or reflectors on the piling structures other than the above-described series of yellow direction and white approach direction lights.

The entirety of the row of piling structures actually constructed--as well as the second, southern row that was authorized but not constructed--lies within a "Security Zone" established in the Code of Federal Regulations, which forbids unauthorized persons from coming within certain distances of the shoreline at NASJAX. See 33 C.F.R. § 165.722 (2002).  That security zone, which extends out 400 feet from the shoreline for the relevant stretch of River bank, was established in 1995 after a period of public comment. See id.  The zone is designated on Chart 11492 by a prominent dashed magenta line next to which, in two places, is the legend "Security Zone 165.722 (See Note A)."  Note A of the chart refers the reader to the relevant volume and chapter of a publication entitled "United States Coast Pilot" (Dkt. 28, Ex. S-5), a NOAA publication which, inter alia, reprints the C.F.R.'s precise description of the boundaries of the security zone (i.e., with reference to such things as landmarks, and latitude and longitude).

The Chart notes the presence of the row of piling structures actually constructed–i.e., the northernmost–as well as an additional, identical one to its south, the structure which was approved but not constructed.  These structures are each indicated by short dashed black lines

15

extending out from the shore and ending in circles. Next to these structures is the legend "Piling (lighted)." Both of these structures are shown to be entirely within the dashed purple line designating the security zone. Further, the northern of the two charted structures lies almost entirely in an area of blue tinting, which indicates shallower water and/or other hazards.[17] Within that area of blue tinting, the sounding nearest to the subject piling structures shows a depth of only five feet at mean low water. By contrast, in the vicinity of Piney and Black Points, the thalweg[18] of the River ranges between twenty-two and twenty feet deep at mean low water. Likewise, the federally maintained channel in that area, as designated by aids to navigation, averages thirteen to twenty feet deep at mean low water.

> **B.    NOAA Chart 11492's Depiction of Aids to Maritime Navigation and of the Subject Piling Structures**

Approximately eight-tenths of a mile[19] due east of the piling structures is the officially established and maintained maritime aid to navigation number 7. On the Chart, this aid is indicated by a "light dot" (a solid black circle) and a "magenta flare," these together comprising

_____

[17] This blue tint "emphasizes the approximate extent of the zone considered to be the most threatening to the majority of mariners using the chart. It generally includes that area which is most affected by deposition and erosion. It is the area where bars, reefs, and isolated rocks are usually located." 1 NCM § 1.2.2 at 1-12. One side boundary of such a blue-tinted area is adjacent to the foreshore, that part of the beach (if any) between high and low water at ordinary tides. See id. The other side-boundary of such a tinted area is "a particular depth contour, the selection of which varies according to the area and purpose of the chart." See id. (A contour is a "line connecting points of . . . equal depth." See 2 NCM App. I at I-38). In the case of the Chart 11492, in the vicinity of the subject piling structures, the blue-tinted area is bounded on its western side by the bulkhead separating the River bank from the River and on its eastern side by the deeper portions of the River. See Dkt. 28, Ex. S-4. The average water depths within this tinted area near the subject piling structures range from 2 to 5 feet, while the average depths just outside that tinted area range from 7 feet to deeper depths. See id.

[18] In the case of a river, the thalweg is the theoretical line which follows the deepest part of the river's bed. See Oxford English Dictionary (3d ed. 1989), http://dictionary.oed.com/cgi/entry/00250262. It is not necessarily the same as the federally maintained channel. Nor is the thalweg necessarily the most navigable channel in the river. See Louisiana v. Mississippi, 466 U.S. 96, 100-01 (1984).

[19] References herein are to statute, versus nautical, miles.

the traditional mark for depicting an official aid to navigation on a NOAA chart.[20]  Next to this

symbol appears the label "Fl G 2.5s 16ft 3M '7'."  Reference to the explanatory notes and

abbreviations section of the Chart, or to the U.S. Coast Guard Light List (Dkt. 25, Ex. 7 at

p.69)[21] referenced on the Chart, or to the Nautical Chart Manual (1 <u>NCM</u> § 5.2.2 at 5-4 to 5-7)

decodes the information in that label as follows: this marker bears a <u>F</u>lashing light which is

<u>G</u>reen; that light flashes at a <u>2.5 s</u>econd interval; and the marker sits <u>16 ft</u>. above mean high

---

[20] In its prior Order, the Court attempted  to describe this symbol in layman's terms, likening it to an exclamation point "rotated about 15 degrees clockwise or counterclockwise" off of vertical and stating, based on observation of certain other markers on the Chart, that it appeared that the "direction in which the mark is rotated varies depending on which side of the channel the marker designates." <u>See</u> Dkt. 43 at 8 n.7.  Since that Order, the Court has been provided with, and has thoroughly reviewed, a complete copy of the Manual; the Court has also further reviewed the subject Chart.  These reviews have revealed two inaccuracies in the Court's prior description of that symbol.  (However, these inaccuracies are immaterial to the Court's prior holding or the holding set forth herein.)

First, the symbol for a navigation aid has two components: the lower component comprised of a small, solid black circle (a "light dot"), and the upper component comprised of a magenta, or purple-pink, "flare," a shape that resembles the upper portion of an exclamation point.

However, the upper component, known as the magenta flare, is not rotated 15 degrees off of vertical and does not indicate the side of the marker one should pass in order to remain in the channel.  Rather, the magenta flare "should be directed toward the label [of the aid to navigation that it indicates], if possible, and should avoid obscuring other detail." <u>See</u> 1 <u>NCM</u> § 5.2.1 at 5-4.  The flare should be at the same angle as the orientation of buoy symbols, or about 25 degrees off vertical. <u>See</u> 1 <u>NCM</u> § 5.2.1 at 5-4, § 5.3.1 at 5-13.

Also, the magenta flare does not indicate on which side of the aid one should pass in order to stay within the channel.  Rather, that determination is made by reference to the color (green or red) of the navigational aid and/or its light and pursuant to the nautical rule of "Red-Right-Returning." <u>See</u>, <u>e.g.</u>, <u>Bearce v. United States</u>, 614 F.2d 556, 561 n.8 (7th Cir. 1980); <u>see also</u> 33 C.F.R. § 62.21(e)(defining "Conventional Direction of Buoyage" as the direction in which a vessel enters navigable channels when proceeding from seaward or, in a clockwise fashion when proceeding around land masses (i.e., southerly down the Atlantic Coast or Intracoastal Waterway)); 33 C.F.R. § 62.45(b)(1),(2)(explaining that, when proceeding in the "Conventional Direction of Buoyage," green aids to navigation or those with green lights are to be passed on the port (left) side of the vessel, while red aids to navigation or those with red lights are to be passed on the starboard (right) side).

[21] The Light List sets forth the same information as does the Chart for official markers in the federally maintained channel, as well as the characteristics of many private aids to navigation.  Many of the latter set forth in the Light List are not shown on the Chart.

There is some dispute as to whether the Plaintiff, as an operator of a small, private vessel, was obligated to consult the Light List, whether by statute, regulation, judicial rule of law, or otherwise.  However, there is no dispute that Chart 11492--of which Plaintiff admits familiarity and the memory of which he purports to have relied upon--expressly advises that, as to aids to navigation, the mariner should also "[c]onsult U.S. Coast Guard Light List for supplemental information concerning aids to navigation." <u>See</u> Dkt. Dkt. 28, Ex. S-4 (lower left-hand side of right panel).

water, is visible from a range of 3 Miles, and bears the number "7."  The Manual permits certain

of the characteristics from the label of an aid to navigation to be omitted where space is a

consideration and dictates the order in which the characteristics are to be omitted, if necessary.

See 1 NCM § 5.2.2.3 at 5-7.  However, the flash characteristic (if any) of the light and its color

(or the color of the daymark, if there is no light) are always retained. See id.

     In contrast to maritime aid to navigation number 7, the piling structures at issue in this

case are indicated on the Chart by a dashed black line extending out from the River bank and

ending in a small, open black circle,[22] with the label "Piling (lighted)" appearing thereby.  No

magenta flare extends from the open circle to the "lighted" legend.  And, unlike the legend for

aid to navigation number 7, the "lighted" label appearing on the Chart by the subject piling

structures gives no characteristics at all (including color) for this light.  Nor does the Light List

set forth the subject piling structure and thus, of course, does not set forth any characteristics

(e.g., solid or flashing; white or colored) for the light on that structure.

**C.     Provisions of the Manual Regarding the Inclusion of Features on a NOAA Chart**

     The principal sources of cartographic data used in compiling new charts and correcting

existing charts are topographic and hydrographic surveys conducted by Coast Survey, as

"supplemented  by  miscellaneous  surveys  and  textual  information  provided  by  other

---

[22] "Piles are long, heavy timbers or section[s] of steel, wood, concrete, etc., which are forced into the seabed to serve as a support for a pier, to resist lateral pressure (as for a pile fender), or to support an aid to navigation." 1 NCM § 4.13.7.  The term "piling" refers to a "group of piles set in a row." 2 NCM App. I at I-153.  An open black circle is used to depict a single pile, see 1 NCM § 4.13.17, while a dashed line beginning and/or ending with a closed circle is used to depict a row of piles. See DRG at 355-3.  Submerged piles are labeled in italics, while visible ones are labeled in normal type. See 1 NCM § 4.13.7.

organizations." 1 <u>NCM</u> § 2.3 at 2-8.  Cartographers are to use the original source materials in

preparing new charts or correcting existing ones; these materials are retained and microfilmed.

<u>See</u> <u>id.</u> at 2-9.  The Manual further states that:

> All available sources of information should be used in the
> construction of a chart.  These sources include the Military and
> other Federal Government agencies, State and local agencies and
> private organizations.

<u>See</u> <u>id</u>.  Among the sources that the Manual suggests should be considered are U.S. Army Corps

of Engineers construction permits and various U.S. Coast Guard materials. <u>See</u> 1 <u>NCM</u> § 2.3.1.

at 2-9 to 2-10.  All of the foregoing are known as "source information."

### D.      Source Information on Which the Subject Piling Structures Were Charted

Submitted herein by the Defendant is NOAA's microfilmed file of source information

on which it drew in depicting the subject piling structure on the Chart at issue. <u>See</u> Dkt. 46,

Attach., Ex. C thereto.  The source information consists of four pages comprising what appear

to be three separate items.

The first item is a memo. <u>See</u> Dkt. 46, Attach., Ex. C thereto (first two pages).  While the

first page of this microfilmed copy is of poor quality, it can be determined that the document

is a "Chart Correction Letter," <u>see</u> <u>id</u>. (first page, upper third, left side); however, the identity

of the author and intended recipient cannot be determined.  The memo, dated September 16,

1975, <u>see</u> <u>id</u>. (first page, lower right corner) contains three columns of information: NOAA (then

"USC&GS") chart affected, COE permit number, and description of the feature.  For these

categories of information, the entry relevant to the subject piling structures lists the NOAA chart

affected as "685," the COE permit number as "73-1157", and a description of "helicopter approach lighting, Jax., FL." See id. (second page).

The second item is what appears to be a post card sent by the Corps to the Navy to inquire about the status of "Permit No. 73-1157" issued to the Navy in "Nov 1973" for "helicopter approach lighting, St. Johns River, Jax, FL." See Dkt. 46, Attach., Ex. C thereto (third page).  A Project Manager with the "Southern Division, Naval Facilities Engineering Command, Charleston, S.C." has filled out the card, stating that the permitted project "was completed" on "May 30, 1975." See id.  The card also cross-references that it regards "Chart No. 685." See id.

The third item, as can be deduced from its caption, is a copy of the drawing attached to the Corps' permit issued to NASJAX for the construction of the subject piling structures.  See Dkt. 46, Attach., Ex. C thereto (fourth page).  The drawing cross-references Corps "Permit (73-1157)" and "CHT # 685" and also contains an inset map "FROM USC&GS Chart 685," with longitude and latitude references, locating the subject piling structures on the River bank between Piney Pt. and Black Pt.  The drawing also contains the following, non-isometric depictions of the subject piling structures: side (or elevation) view, top (or "birds-eye") view, and a front / section view.  At various places on the drawings, the lights or lighted nature of the piling structures are referred to as "PROPOSED APPROACH LITE SYSTEM," "LITES," "APPROACH LITE," or  "PROPOSED HELICOPTER APPROACH LIGHTING AT THE USNAS JAX . . . ."  No other information regarding the lights is provided, including their number, color, flash characteristic, orientation, hours of operation, etc.

### E.    Plaintiff and the Night of December 12, 1998

According to his Affidavit (Dkt. 38), Plaintiff Simmons is an avid boater who has many times plied the waters between the Fuller Warren Bridge and Julington Creek.[23]  Both from reviewing the relevant Chart and from his experience on the River, Plaintiff avers that he is familiar with the various aids, hazards, and other structures along this portion of the River, including the subject piling structures and the Chart's notation that such are "(lighted)." Specifically, Plaintiff states that the piling structures in question were present prior to December 12, 1998, and had been noted on prior editions of NOAA charts used by him since at least 1985. Further, Plaintiff avers that he had seen the lights on the piling structures illuminated at night "on a number of occasions" prior to December 12, 1998.

In his Affidavit, Plaintiff describes the evening of December 12, 1998, as "dark" and "misty," with "no moon or stars visible," and no lights burning along the waterfront at NASJAX including, as he would later discover, the approach and landing direction lights on the subject piling structures.  Earlier that evening, Plaintiff had launched his approximately 16 foot outboard motorboat from Julington Creek and traveled north, past Piney and Black Points, to the River City Brewery, a restaurant and bar on the River across from downtown Jacksonville. Later that night, Plaintiff was returning upriver (i.e., south), keeping the green channel markers

---

[23] The Fuller Warren bridge is near downtown Jacksonville, further downriver, and thus north, of the area between Piney Point and Black Point where the allision occurred.  Julington Creek is an inlet off the east bank of the River, south of the area between Piney Point and Black Point. See Dkt. 28, Ex. S-4.

to his left and using shore lights on his right to guide his way.[24]  On neither his trip downriver (i.e., going North) or the return trip upriver (i.e., going South) did Plaintiff use NOAA Chart 11492, as he did not have it with him on the night in question.  Rather, Plaintiff avers that as he came upriver he navigated by sight, relying on his knowledge of the River and the Chart, and staying close to the western bank of the River.  Plaintiff avers that he did so in order to avoid barge traffic.

Plaintiff states that, as he rounded the bend in the River just north of Piney Point, he began to look for the lights on the subject piling structures to use them to navigate.  However, because of the lack of natural light, the apparently extinguished shore lights at NASJAX, and the extinguished lights on the piling structures, Plaintiff did not see the subject piling structures before alliding with one of them, resulting in personal injuries to himself and property damage to his vessel.

## V.      Subject Matter Jurisdiction and the Discretionary Function Exception

Plaintiff's remaining claim asserts that the Defendant United States, through the acts and omissions of NOAA, was negligent in including, marking, and/or describing the subject piling structures and their lighting on Chart 11492--i.e., that Chart 11492 is false or misleading in its description of the subject piling structures as "(lighted)."  The Defendant asserts that the DFE excepts these acts and/or omissions from the United States' waiver of sovereign immunity for

---

[24] There are three official, federally maintained aids to navigation in the general vicinity of the subject piling structures: lighted flashing green aid number 5, located approximately two miles north-northeast of the subject piling structure; lighted flashing green aid number 7, located approximately eight-tenths of a mile east thereof; and (unlighted) green daymark number 9, located approximately one and one-half miles south-southeast thereof.  In this area of the River, there are no corresponding lighted red aids or red daymarks opposite the green or green lighted aids--only the green aids, which designate (in this case) the eastern edge of the channel in which vessels should travel. See 33 C.F.R. § 62.45(b)(1).

maritime torts under the SIAA, and thus that Plaintiff's claims based on such acts and/or omissions are outside of this Court's subject matter jurisdiction.

### A. The SIAA and the DFE

The parties agree that this maritime tort is properly asserted against the United States, if at all, under the Suits in Admiralty Act ("SIAA"), as that statute provides the sole jurisdictional basis for admiralty claims against the United States. See Mid-South Holding Co. v. United States, 225 F.3d 1201, 1203 (11th Cir. 2000).  The SIAA waives the sovereign immunity of the United States, providing, in pertinent part, as follows:

> In cases where . . . if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . .

46 U.S.C. App. § 742.  Although not expressly contained in the SIAA, the Eleventh Circuit--and almost every other federal appeals court to consider the issue--has held that the SIAA is subject to the Discretionary Function Exception ("DFE"), which is expressly stated in the FTCA. See Mid-South Holding, 225 F.3d at 1203-04 (noting Tew v. United States, 86 F.3d 1003, 1005 (10th Cir. 1996)).[25]

The DFE, as contained in the FTCA, provides that the government is not liable for

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

---

[25] As noted by the Eleventh Circuit in Mid-South Holding, in the Tew decision the Tenth Circuit listed decisions from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits holding that the DFE applies to the SIAA.

28 U.S.C. § 2680(a).  More simply stated, the DFE excepts from the waiver of sovereign immunity that government conduct which involves an element of judgment or choice and is grounded in public policy considerations.

As the Eleventh Circuit has noted,

> The Supreme Court has articulated a two part test to determine whether the challenged conduct falls within the discretionary function exception. First, the conduct must be discretionary in nature, that is it must "involv[e] an element of judgment or choice." "This requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.' " Second, the judgment or decision must be grounded on considerations of social, economic, or political public policy.

Theriot v. United States, 245 F.3d 388, 397 (11th Cir. 1998)(internal citations omitted).

As the Supreme Court has explained, this second part of the test exists to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in . . . policy [considerations] through the medium of an action in tort." Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)(citations omitted).

**B. Application of DFE to the Actions of NOAA**

**1.    First Prong of the DFE**

As for the first prong of the DFE test, the Secretary of Commerce has discretion whether to compile and issue nautical charts.  Specifically, the Secretary

> is authorized to conduct the following activities:
> * * *
> (2) Processing and publication of data, information, compilations, and reports;

(3) Compilation and printing of nautical charts; [and]
(4) Distribution of nautical charts and related navigational publications;

33 U.S.C. § 883b.  Plaintiff does not contest that this statute vests the Secretary with such discretion.

Likewise, the Manual and the Guide, the only identified statements of NOAA policy and practices regarding the production of nautical charting, provides discretion in whether particular features are depicted on a chart.[26]  Specifically, the Manual states:

> Nautical charts . . . differ from maps in that standardized specifications cannot be applied indiscriminately to them. . . . The drafting of standardized rules covering particular features often leads to a misguided attempt to give a chart uniform treatment throughout, whereas an essential element of successful chart compilation is that different considerations apply as a compiler works from inshore to offshore areas, or along an open coast toward a shoal-encumbered estuary, or inland from the coastline. Therefore, the specifications outlined in this Manual are to be used as guidelines and the ultimate decision regarding depiction of the various features appearing on nautical charts must rest on the professional judgment of the cartographer.

> Chart symbols are designed to convey to the navigator quickly, clearly, and unmistakably the information necessary for safe navigation.  The graphic methods for charting coastline features encompass various combinations of individual symbols and symbol patterns, line drawings in which the line itself may be varied (as to line width, solid vs. dashed lines, etc.), screen tints, and legends. Too many symbols reduces the legibility of charts and the ease and speed with which they can be interpreted.  Thus, simplicity is a key element in good chart compilation and one regarding sound cartographic judgment.

---

[26] It is clear that, in addition to statutes and regulations, the first prong of the DFE analysis also properly considers an agency's internal procedures and guidelines. See Limar Shipping Ltd. v. United States, 324 F.3d 1, 8 n.6 (1st Cir. 2003).

1 <u>NCM</u> § 1.2.1 at pp.1-10 to 1-11.[27]

According to Capt. Perugini, the subject piling structures are properly classified and depicted under the Manual's symbols and nomenclature.  Specifically, within the Manual, a "chartable marine structure is a man-made structure anchored or otherwise fixed in position in a navigable waterway or foreshore area and stationary in that position at least through the normal boating season." 1 <u>NCM</u> § 4.13 at 4-56.  And within the more general category of "marine structure," is the subcategory of "mooring structures," which includes "piles." <u>See</u> <u>id</u>. § 4.13.7 at 4-67.  "Piles" are defined as:

> long, heavy timbers or section[s] of steel, wood, concrete, etc., which are forced into the seabed to serve as a support for a pier, to resist lateral pressure (as for a pile fender), or to support an aid to navigation. . . . Piles visible at the Shoreline Plane of Reference shall be charted with a 1-mm circle and labeled 'Pile' . . . . Submerged piles shall be labeled in . . . italics.

<u>Id</u>.  Likewise, the Guide provides that piling–i.e., a row of piles–are denoted by small dots connected by a dashed line. <u>See</u> <u>DRG</u> at 355-3.

While not argued by the Defendant, review of the Manual indicates that the subject piling structures could, arguably, also fall within two other categories defined in the Manual and--with one small exception noted below--are properly depicted and labeled under those other categories.

---

[27] The foregoing does, arguably, contradict certain provisions of the Manual regarding exactly how certain features are charted and/or labeled.  While, from the Court's review of the Manual, it remains clear that the choice to depict items is discretionary, in certain instances exactly how those items are depicted does not appear to be discretionary. <u>See</u>, <u>e.g.</u>, 1 <u>NCM</u> § 5.2.2 at 5-5 ("Large-scale charts shall provide complete information as to light characteristics [of aids to navigation]."); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Id</u>. § 5.2.2.2 at 5-7 ("On large-scale charts, the characteristics of the lights [on aids to navigation] shall be shown in the following order . . . .").  However, as discussed in the following text, no such arguably "mandatory" provision of the Manual is implicated in this case.

First, the subject piling structures could be considered "markers," objects that are not officially-maintained aids to navigation and which can be used for nearly any purpose. See 1 NCM § 5.6 at 5-20.  Markers not verified to within ten feet of their true locations are denoted with the position approximate symbol: a small, open black circle, see id., like that used on the subject Chart to denote the end of the subject piling structure.

Second, the subject piling structures could be considered a "landmark[, which] is any fixed natural or artificial object, generally on land, which is prominent from seaward and can be used in determining a vessel's direction or position[, but which category of features] excludes objects expressly created for navigational purposes . . . ." 1 NCM § 6.1; see also id. § 5.1 at 5-2 ("Lights and beacons not intended as guides for normal surface navigation should be shown with a landmark symbol and identifying label, if charted.").  An "approximately located" or "approximately positioned" landmark--i.e., one not verified within ten feet of its true location, but generally considered to be within 100 feet of its correct geographic location--is denoted with the approximate position symbol: a small, open black circle, see 1 NCM § 6.1.3 at pp.6-4 to 6-6, like that used on the subject Chart to denote the end of the subject piling structure. Additionally, a landmark is labeled with a primary name most likely to identify it for the majority of users; it can also possess a secondary name (in parentheses), which is an alternate name that may be useful to some marine interests, and/or a description (in parentheses), which elaborates on its primary name. See 1 NCM § 6.1.4 at 6-7.[28]

---

[28] A landmark's label also reflects the accuracy of its charted position. See 1 NCM § 6.1.4.1.  An "accurately located" landmark--i.e., one that is verified to within ten feet of its correct geographic location--is labeled using all capital letters for its primary name, as well as its secondary name and description, if any. See id. § 6.1.4.1.a.  An "approximately (continued...)

According to the Manual, markers and landmarks may be designated as "lighted" if known to be so. See 1 NCM § 5.6 at 5-21 (regarding markers); id. § 6.1.4.1.b.(2) at 6-8 (regarding landmarks).  The Guide is in accord. See DRG at 850-9, 240-18,  (regarding, respectively, markers and landmarks).  However, no magenta flare is used to depict piles, markers, or landmarks that are lighted, as none are official aids to navigation. See 1 NCM § 5.2; see also id. § 5.2.3 at 5-7 to 5-8 (noting that the "[magenta] flare is used to emphasize a light's dependability").  By the same token, light characteristics are also not noted in the labels of piles, markers, or landmarks that are lighted, because none are official aids to navigation. See id. § 5.2.2.2 at 5-7.  This is consistent with the Manual's general limitation of the use of magenta flares and labels (noting light characteristics) to the depiction of official maritime aids to navigation. See id. § 5.1 at 5-2 ("The standard light and beacon symbols shall be reserved for those aids to navigation which are intended as guides for normal surface navigation and which are listed in the USCG Light List.").[29]

From the above it is clear that NOAA is vested with discretion, both by the relevant statute and by the agency's own policy statements, in whether to chart particular features on a

---

[28](...continued)
located" landmark is labeled using an initial capital letter and, otherwise, lower-case letters for each word of its primary and its secondary name, if any. See id. § 6.1.4.1.b.  Only the first letter of the first word of the description, if any, of an approximately located landmark is capitalized. See id.  The label for the subject piling structures observes the convention for approximately located landmarks as regards its primary name, "Piling," but not as regards its description, "(lighted)."

[29] The one exception noted in the Manual is the use of a "a standard light dot--i.e., closed, black circle--with a magenta flare" to depict one particular type of aeronautical light: the rotating white and green navigation lights usually associated with airports. See 1 NCM § 5.2.3 at 5-7.  These lights are included because they are conspicuous and are the most dependable non-maritime lights during their hours of operation. See id.  As described above, the fixed yellow landing direction and white approach directions lights on the subject piling structures are not such a white and green rotating aeronautical light.

nautical chart and in using non-NOAA data in doing so.  The foregoing also makes clear that, to the extent they were standards prescribing the manner in which those features selected for charting are actually charted, the subject piling structures were properly depicted on the Chart according to the standards established by NOAA in the Manual and the Guide, and no mandatory provisions of the statute, Manual, or Guide were violated.  The first prong of the DFE analysis is thus satisfied.

### 2.      Second Prong of the DFE

Plaintiff's arguments are not clearly directed at the particular elements of the DFE analysis.  Instead, he essentially argues that the acts and/or omissions of NOAA are outside the DFE because "once the decision to chart an obstruction to navigation is made then the United States must chart that obstruction non-negligently and must not just rely on data from other governmental agencies that are not responsible for safe navigation." Dkt. 48 at 3.[30]

Nevertheless, the primary thrust of Plaintiff's arguments--a challenge to NOAA's decision to use the source information originating from another agency and a challenge to how

---

[30] Although it lacks citation to any specific case, this argument echoes the line of authority previously rejected by this Court: the line represented by such cases as Indian Towing Co. v. United States, 350 U.S. 61 (1955)(holding government liable under FTCA for injuries resulting when government did not maintain lighthouse beacon) and Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951)(holding government's decision regarding where to place buoy to mark wreck was not protected by DFE).  As noted in the Court's prior Order, these cases are distinguishable. See Dkt. 43 at 18 and n. 16.  Indian Towing has widely been recognized as not involving application of the DFE. See, e.g., Monzon v. United States, 253 F.3d 567, 572 (11th Cir. 2001).  And Somerset Seafood well predates the Supreme Court's important decision in Gaubert v. United States, 499 U.S. 315 (1991), wherein the Court substantially modified the DFE analysis and abandoned the old "operational/planning" analysis.  Further, in Limar, discussed below, the First Circuit rejected a similar argument in a case presenting highly analogous facts. See Limar Shipping Ltd. v. United States, 324 F.3d 1 (1st Cir. 2003).

NOAA used that information[31]--addresses the issue most bound up with the analysis of the second prong of the DFE analysis: was the discretion exercised in whether and how to chart the subject piling structures based on the source information grounded in considerations of social, economic, or political public policy?

In his Declaration, Capt. Perugini states:

> The inclusion of any particular feature on a chart, as well as the extent and manner of its depiction, depends upon many factors, including the importance of the feature, the resources available to determine and verify its location and characteristics, the size and scale of the chart, the availability of other information, the vagaries of the coastline, and the status of the user.

Dkt. 46, Attach. at p.2. The above factors clearly implicate policy considerations, particularly those economic and social.

Further fleshing out those factors, Defendant notes that a review of Chart 11492 shows that there are literally "hundreds of piers, obstructions, pilings, and other structures" along the banks of the River, and that is just for the approximately forty to fifty miles of the River depicted therein. Defendant asserts that it would be logistically and economically impossible for NOAA to even verify the existence of every one of these structures, much less to observe and document each sufficiently to provide, and continually update, a proper description of each. And the foregoing leaves aside the facts that a chart containing descriptions of all those

---

[31] From Plaintiff's argument apparently using the district court's opinion in <u>Limar Shipping Ltd. v. United States</u>, 206 F.Supp. 2d 61 (D.Mass. 2002), one could infer that the Plaintiff herein is not challenging NOAA's decision to use the source information that it did in charting the subject piling structures, but rather is only challenging how that source information was used--e.g., how it was interpreted; its use without verifying it. <u>See</u> Dkt. 48 at 2. However, the Plaintiff's subsequent citation to and argument from the <u>De Bardeleben</u> and <u>The Glacier Bay</u> cases--which both deal more generally with omissions in charting or asserted erroneous charting--makes it unclear whether Plaintiff is so limiting his argument. <u>See</u> Dkt. 48 at 2-3. Thus, it will be presumed Plaintiff is making the broader challenge stated above.

structures would be so cluttered as to be unreadable and thus useless to a mariner; that all of these structures are constantly subject to movement and destruction by the forces of nature; and that the man-made structures are of varying ages, may or may not be regularly maintained and, in the case of any lighting, cannot be known to be operated reliably.

Plaintiff responds by asserting that the United States

> must not just rely on data from other governmental agencies that are not responsible for safe navigation.
>
> * * *
>
> The actual use of the data provided to NOAA by the Army Corp[s] of Engineers was negligent in that NOAA knows the Army Corp[s] of Engineers does not have the same requirements for safety to mariners to chart and properly describe hazards to navigation.

Dkt. 48 at 3-4.[32]  Further, Plaintiff argues that the asserted error in denoting the piling as "lighted" has lasted for 23 years, "a sufficient time for the government to correct it." Id. at 4.

The above discussion makes clear that NOAA's discretionary decision to use the Corps' data implicates significant economic and social policy considerations--to borrow language from another Eleventh Circuit DFE opinion, that NOAA's acts and omissions in depicting the subject piling structures "require[d ] the exercise of policy judgment based upon the resources available and the relative risks to the public health and safety from alternative actions." See Theriot v. United States, 245 F.3d 388, 400 (11th Cir. 1998).  The human effort and expense to verify and sufficiently survey, and routinely update, each of the many obstructions in the River would

---

[32] The record does not disclose who transmitted the source information to NOAA.  Given that the subject piling structures were a Navy project and that much of the information in the record originated with the Navy (response to inquiries re project status, drawings accompanying the permit request)--though perhaps it was passed on to NOAA by the Corps--it seems more correct to attribute the information to the Navy.  However, because the Navy and the Corps are both agents of the Defendant, this is a distinction of no significance here.  Thus, consistent with Plaintiff's argument, the Court will refer to the source information as the Corps' data.

likely consume many of NOAA's resources and leave it unable to pursue its other important endeavors, such as weather forecasting.  In the context of such realities, the decision to use information from other federal agencies--however skeletal it might be and without verifying such--is a further weighing of competing policy interests.  Furthermore, it cannot be overlooked that the decision to use the Corps' data was made as regards to a structure: that is short (only 300 feet long) in an area where the River is over 2.5 miles wide; was not an official aid to navigation; exists in an area of the River in close proximity to other lighted, official aids to navigation; lies almost entirely within an area of shallower water that is otherwise marked on the Chart (by tinting) to indicate dangers to navigation; and lies entirely within, and well inside, a charted security zone.

This conclusion is bolstered by the apposite decision in <u>Limar Shipping Ltd. v. United States</u>, 324 F.3d 1 (1st Cir. 2003).  <u>Limar</u> involved an SIAA suit against the government by a vessel owner and its operator, who sought recovery for damages sustained when their vessel scraped the Boston harbor floor while navigating inside the federally maintained channel.  <u>See id</u>. at 4-5.  In preparing the chart which the vessel was using at the time of the grounding, NOAA had relied on, inter alia, a Corps' hydrographic survey of the harbor and channel, which survey was conducted for the purpose of ascertaining condition of the harbor and channel, and not for the purpose of preparing a nautical chart therefrom.  <u>See id</u>. at 5, 8.  The Corps' survey had been prepared pursuant to the Corps' guidelines, which permitted depth soundings to be taken at much larger intervals than required by NOAA's standards for hydrographic surveys. <u>See id</u>. at 5.  Inter alia, the <u>Limar</u> plaintiffs asserted that NOAA was negligent in relying on the

Corps' survey to create that chart at issue there; the United States defended by asserting that NOAA's decision to use the Corps' survey was protected by the DFE. See id. at 5-6.  Finding no NOAA statute, regulation, or other policy directive requiring that particular types of hydrographic surveys be used, or prohibiting the use of non-NOAA surveys, in preparing NOAA nautical charts, and finding NOAA's decision to use the Corps' survey driven by the "quintessentially policy-based" concerns of resource allocation and budget management, the First Circuit held that NOAA's decision to use the Corps' survey fell within the DFE. See id. at 9-10.  The primary cases Plaintiff presents in opposition are not persuasive.[33]

Plaintiff relies on the former Fifth Circuit's decision in De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5th Cir. 1971) and, in particular, a passage therein regarding the United States' duty in issuing nautical charts. See id. at 148-19.  This case would otherwise be binding precedent, see Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981); however, it is clear that De Bardeleben is no longer the law of this, or the current Fifth, circuit and the case is otherwise inapposite.

The De Bardeleben decision involved the same general issue presented here: whether sovereign immunity shielded the United States from liability for omissions from a Coast and Geodetic Survey nautical chart. See id. at 142.  However, therein the Fifth Circuit held that the

---

[33] Likewise, Plaintiff's arguments are also unpersuasive to the extent that he apparently relies on portions of the district court's opinion in Limar that are arguably broader than the First Circuit's opinion therein.

DFE is not implied in the SIAA, and thus went on to decide the scope of the duty owed by the United States and to make the above-referenced statements quoted in Plaintiff's Supplemental Memorandum.  However, De Bardeleben is simply not an apposite decision in that it never reached the issue of whether cartographic functions are protected by the DFE.  Thus, De Bardeleben has been declared to be dicta, see Wiggins v. United States, 799 F.2d 962, 964-65 (5th Cir. 1986)(holding also that De Bardeleben is not binding in the 5th Circuit), and later opinions by both the 5th and 11th Circuits, in the wake of various Supreme Court decisions, have held that a discretionary function exception is implied in the SIAA. See Wiggins, 799 F.2d at 964-65; Williams v. United States, 747 F.2d 700 (11th Cir. 1984).

Plaintiff also relies on United Cook Inlet Drift Assoc. v. Trinidad Corp., (In re The Glacier Bay), 71 F.3d 1447 (11th Cir. 1990)(holding DFE did not shield NOAA from liability for defective chart where NOAA hydrographers deviated from established procedures in charting manual).  For the same reason as the Limar court, this Court finds the decision in The Glacier Bay to be inapposite. See Limar, 324 F.3d at 10 (finding The Glacier Bay involved NOAA's failure to follow it own procedures in surveying and charting, as opposed to its

decision to use information in the form of a Corps survey).[34]  For these reasons, the Court concludes that the second prong of the DFE is also satisfied.

Thus, the DFE excepts from the SIAA's waiver of sovereign immunity those acts and/or omissions of NOAA in including, marking, and describing the subject piling structures on Chart 11492.  Accordingly, Plaintiff's claims based on those acts and/or omissions are outside this Court's subject matter jurisdiction, and those claims will be dismissed.

Upon consideration of the foregoing, it is hereby **ORDERED**:

1. Plaintiff's Motion to Strike (Dkt. 49) is **DENIED**.

2. Defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(1), etc. (Dkt. 24), as supplemented by Defendant's Supplemental Memorandum (Dkt. 46), is **GRANTED** and Plaintiff's Count I Suits in Admiralty Act claim, to the extent based on the Defendant's asserted negligence in charting the subject piling structures, is **DISMISSED** for lack of subject matter jurisdiction.

3. The Clerk is **DIRECTED** to enter judgment at this time and to close this case.

4. All other pending motions are **DENIED as moot**.

---

[34] Lastly, in his Supplemental Memorandum Plaintiff asserts:

> An exhaustive analysis of the cases dealing with the issue of the liability of the United States for the injuries arising from the issuance, preparation, or distribution of charts, maps, or like navigational aides [sic] can be found at 164 ALR Fed 541  "[sic](2000).

Dkt. 48 at 4.  The substantive portion of this ALR entry is some forty pages long, discusses over three dozen cases, and cross-references nearly a score of other ALR entries.  Yet the above is the entirety of Plaintiff's citation thereto.  Plaintiff provides no pinpoint citation to any particular page(s) thereof.  Nor does he point out any particular case(s) discussed therein.

Such a general citation improperly attempts to put off on the Court the burden of reviewing a source and gleaning therefrom the particular arguments that Plaintiff would make.  Such is improper in our adversary system.  Thus the Court has not considered this cited source, except to the extent cases discussed therein were otherwise cited by the parties or uncovered in the Court's own research.

**DONE AND ORDERED**, at Jacksonville, Florida, this __25___ day of May, 2005.

Copies to:          Counsel of record

JOHN H. MOORE II
United States District Judge